**UNITED STATES of America, Plaintiff,**

v.

**Jake BAKER and Arthur Gonda, Defendants.**

**Crim. No. 95–80106.**

United States District Court, E.D. Michigan, Southern Division.

June 21, 1995.

Kenneth R. Chadwell, Asst. U.S. Atty., Christopher P. Yates, Asst. U.S. Atty., Detroit, MI, for plaintiff.

Douglas R. Mullkoff, Ann Arbor, MI, for defendant.

## OPINION

COHN, District Judge.

"It is not the policy of the law to punish those unsuccessful threats which it is not presumed would terrify ordinary persons excessively; and there is so much opportunity for magnifying or misunderstanding undefined menaces that probably as much mischief would be caused by letting them be prosecuted as by refraining from it."

*The People v. B.F. Jones,* 62 Mich. 304, 28 N.W. 839 (1886).

### I.  Introduction

This is a criminal prosecution under 18 U.S.C. § 875(c).  Defendant Jake Baker (Baker) is charged in a superseding indictment with five counts of transmitting threats to injure or kidnap another, in electronic mail

(e-mail) messages transmitted via the Internet.[1] Now before the Court is Baker's motion to quash the superseding indictment.[2] For the reasons that follow, the motion will be granted.

## II. Background

The e-mail messages that form the basis of the charges in this case were exchanged in December, 1994 between Baker in Ann Arbor, Michigan, and defendant Arthur Gonda (Gonda), who sent and received e-mail through a computer in Ontario, Canada. Gonda's identity and whereabouts are unknown. The messages excerpted in the superseding indictment are drawn from a larger e-mail exchange between Gonda and Baker began on November 29, 1994, and ended on January 25, 1995. The specific language of the messages excerpted in the superseding indictment will be discussed in detail below. They all express a sexual interest in violence against women and girls.

Baker first appeared before a United States Magistrate Judge on a criminal complaint alleging violation of 18 U.S.C. § 875(c), on February 9, 1995. The complaint was based on an FBI agent's affidavit which cited language taken from a story Baker posted to an Internet newsgroup entitled "alt.sex.stories," and from e-mail messages he sent to Gonda. The story graphically described the torture, rape, and murder of a woman who was given the name of a classmate of Baker's at the University of Michigan. The "alt.sex.stories" newsgroup to which Baker's story was posted is an electronic bulletin board, the contents of which are publicly available via the Internet. Much of the attention this case garnered centered on Baker's use of a real student's name in the story.[3] The e-mail messages exchanged between Gonda and Baker were private, and not available in any publicly accessible portion of the Internet.[4]

Baker was arrested on the complaint and warrant on February 9, 1995, and detained overnight. The complaint and warrant is dated the same day. The following day, February 10, 1995, after holding a hearing a Magistrate Judge ordered Baker detained as a danger to the community. His detention was affirmed by a United States District Judge later that day. On March 8, 1995, this Court held a hearing on Baker's motion to be released on bond, and ordered that a psychological evaluation of Baker be performed. The psychological evaluation was received on March 10, 1995. The evaluation concluded that Baker did not pose a threat, and the Court ordered him released that day.[5]

---

1. Computer networks are systems of interconnected computers that allow the exchange of information between the connected computers. The Internet is the world's largest computer network, often described as a "network of networks." The Internet is decentralized in that there is no central hub through which messages or information must be routed, and no central governing body. For a brief discussion of computer networks and their uses, see Edward Cavazos and Gavino Morin, *Cyberspace and the Law: Your Rights and Duties in the On–Line World,* 2–11 (1994). E-mail allows computer network users to send messages to each other which are received at an "electronic mailbox" identified by the recipient's unique user name and address. *Id.* at 5. A survey of Internet use conducted in October, 1994 counted 13.5 million consumer Internet users, and 27.5 million e-mail users. Peter H. Lewis, *On the Net,* New York Times, May 29, 1995, at 39. The survey tallied male users as outnumbering female users by a ratio of 2 to 1, and children aged seventeen and younger as constituting 2.3 percent of the users. *Id.*

2. The American Civil Liberties Union Fund of Michigan has filed an amicus brief arguing in favor of dismissal.

3. *See, e.g.,* Megan Garvey, *Crossing the Line on the Info Highway: He Put His Ugly Fantasy on the Underneath. Then He Ran Smack Into Reality.,* The Washington Post, March 11, 1995, at H1; Joan H. Lowenstein, *Perspective: How free is speech in cyberspace?,* Chicago Tribune, March 12, 1995, at 1.

4. The messages were apparently stored on the hard drive of the computer in Baker's dormitory room; they may also have been stored on the University of Michigan computer Baker accessed through his account. Baker gave the authorities permission to search his stored e-mail messages.

5. Baker's detention for 29 days is disturbing. The initial University of Michigan General Offense Report dated January 27, 1995, indicates that as early as January 20, 1995, a psychiatric evaluation was performed and concluded that Baker did not display any risk factors for potential violence. The University's investigation began on January 18, 1995. What evaluation, if any, was performed by the Washtenaw County Prosecutor, the logical prosecuting authority, is unknown. The FBI was initially contacted on January 26, 1995. A psychological evaluation

On February 14, 1995 the government charged Baker with violating 18 U.S.C. § 875(c) in a one count indictment based on unspecified communications transmitted in interstate and foreign commerce from December 2, 1994 through January 9, 1995. Presumably included in the communications was the story Baker posted. On March 15, 1995, the government charged Baker and Gonda in a superseding indictment with five counts of violating 18 U.S.C. § 875(c). The story on which the initial complaint was partially based is not mentioned in the superseding indictment, which refers only to e-mail messages exchanged between Gonda and Baker.[6] The government has filed a bill of particulars identifying who it perceives to be the objects of the allegedly threatening transmissions, as well as witness and exhibit lists.

■■■ Baker, who is named in all five of the superseding indictment's counts, has filed a motion seeking dismissal of all the counts of the superseding indictment. He contends that application of 18 U.S.C. § 875(c) to the e-mail transmissions pushes the boundaries of the statute beyond the limits of the First Amendment. The government responds that the motion must be denied because the First Amendment does not protect "true threats," and because whether a specific communication constitutes a true threat is a question for the jury.

### III. The Law

Eighteen U.S.C. § 875(c) reads:

Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

The government must allege and prove three elements to support a conviction under § 875(c): "(1) a transmission in interstate [or foreign] commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure [or kidnap] the person of another." *United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir.), *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992). The Court of Appeals for the Sixth Circuit, like most others, has held that § 875(c) requires only general intent. *Id.* at 149. *But see, United States v. Twine*, 853 F.2d 676 (9th Cir.1988) (finding a specific intent requirement in § 875(c)).[7] Because § 875(c) is a general intent crime, intent must be proved by "objectively looking at the defendant's behavior in the totality of the circumstances," rather than by "probing the defendant's subjective state of mind." *DeAndino*, 958 F.2d at 149. The Sixth Circuit has also held that "a specific individual as a target of the threat need not be identified." *United States v. Cox*, 957 F.2d 264, 266 (6th Cir.1992). Even so, the threat must be aimed as some discrete, identifiable group. *See id.* (involving threat to "hurt people" at a specific bank); *United States v. Lincoln*, 589 F.2d 379 (8th Cir.1979) (involving letters threatening to kill judges of the Eighth Circuit, under 18 U.S.C. § 876). The threat need not be communicated to the person or group identified as its target. *See United States v. Schroeder*, 902 F.2d 1469, 1470–71 (10th Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 181, 112 L.Ed.2d 145 (1990) (affirming § 875(c) conviction for a threat against people at a post office made to an Assistant United States Attorney); *Unit-*

---

was performed at the request of University officials on February 7, 1995, and concluded in a report dated February 9, 1995, that there was "no evidence that [Baker] is a danger to others or himself." Another psychiatric evaluation, also dated February 9, 1995, similarly concluded that Baker "presented no clear and present danger to [the student whose name he had used in the story] or anyone, at the time of the interview." Why Baker was arrested and taken into custody on February 9, 1995, is inexplicable. The government indicated in its supplemental brief that Baker's arrest was justified as preventing "Jake Baker and other like-minded individuals from acting on their violent impulses and desires." In light of the information available at the time of Baker's arrest, this justification seems farfetched.

**6.** At oral argument on May 26, 1995, the government stated that it abandoned the story as a basis of prosecution because it did not constitute a threat.

**7.** Baker recognizes that the Sixth Circuit considers § 875(c) a general intent crime, but asks the Court to "revisit the issue." Because Sixth Circuit precedent is clear on this point, the Court declines the invitation to revisit the point.

ed States v. Kosma, 951 F.2d 549, 555 (3rd Cir.1991) (listing cases in which threats against the President were made to third persons, under 18 U.S.C. § 871).

■■■ Because prosecution under 18 U.S.C. § 875(c) involves punishment of pure speech,[8] it necessarily implicates and is limited by the First Amendment. Although the Supreme Court has not addressed the constitutionally permissible scope of § 875(c), it has considered a similar statute concerning threats against the President, 18 U.S.C. § 871(a),[9] in *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664. In *Watts*, the Supreme Court recognized that:

> a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.

*Id.* at 707, 89 S.Ct. at 1401. Under *Watts*, to pass constitutional muster the government must initially prove "a true 'threat.'" *Id.* Factors mentioned in *Watts* as bearing on whether a specific statement can be taken as

a true threat include the context of the statement, including whether the statement has a political dimension; whether the statement was conditional; and the reaction of the listeners. *Id.*[10] *Watts* also makes clear that the question of whether a statement constitutes a true threat in light of the First Amendment is distinct from the question of the defendant's intent: "whatever the 'willfulness' requirement implies, the statute initially requires the Government to prove a true 'threat.'" *Id.*[11]

The distinction between the two questions of whether a statement is a "true threat" for the purposes of First Amendment limitation, and the intention of the statement's maker, is important but unfortunately often confused. The confusion results from too loose a use of the phrase "true threat."

■■■ The only extended discussion of the constitutional dimension of the "true threat" requirement with regard to § 875(c) is found in *United States v. Kelner*, 534 F.2d 1020 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976). In *Kelner*, the Second Circuit drew on *Watts* to illuminate

**8.** For discussion of legal applications of the speech act theory approach to philosophy of language, see Peter Meijes Tiersma, *The Language of Defamation*, 66 Texas L.J. 303 (1987); Comment, *The Language of Offer and Acceptance: Speech Acts and the Question of Intent*, 74 Calif.L.Rev. 189 (1986).

**9.** 18 U.S.C. § 871(a) provides:

Whoever knowingly and willfully deposits for conveyance in the mail or for delivery from any post office by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President, or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

**10.** While *Watts* involved political speech, the Court must reject the government's implication that *Watts* establishes a separate standard for true threats in the context of political speech.

The *Watts* opinion does not explicitly limit itself to political speech, and the Sixth Circuit has recognized that the political nature of the speech in *Watts* was only one factor considered by the Supreme Court. *Cox*, 957 F.2d at 266. (observing that the Supreme Court in *Watts* "considered the conditional nature of the threat, the fact that it was made during a political discussion, and the fact that the response of the audience was laughter.")

**11.** The constitutional "true threat" question is also distinct from the sort of psycholinguistic threat analysis often performed by the FBI and other investigative agencies. *See* Murray S. Miron & John E. Douglas, *Threat Analysis: The Psycholinguistic Approach*, FBI Law Enforcement Bulletin, Sept. 1979, at 5; Parke Elliott Dietz, et al., *Threatening and Otherwise Inappropriate Letters to Members of the United States Congress*, Journal of Forensic Sciences, Vol. 36, No. 5, Sept. 1991, p. 1445; Parke Elliott Dietz, et al., *Threatening and Otherwise Inappropriate Letters to Hollywood Celebrities*, Journal of Forensic Sciences, Vol. 36, No. 1, Jan. 1991, p. 185. At oral argument, the government acknowledged that the FBI's threat analysis section had not analyzed the communications involved here, but indicated that the FBI agent who obtained the initial criminal complaint may have been in contact with the section.

the constitutional limits of a prosecution under § 875(c):

> The purpose and effect of the *Watts* constitutionally-limited definition of the term "threat" is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are ... "properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues." *Watts*, 402 F.2d at 690.

>     *     *     *     *     *     *

> So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied. This clarification of the scope of 18 U.S.C. § 875(c) is, we trust, consistent with a rational approach to First Amendment construction which provides for governmental authority in instances of inchoate conduct, where a communication has become "so interlocked with violent conduct as to constitute for all practical purposes part of the [proscribed] action itself."

*Kelner*, 534 F.2d at 1027 (quoting T. Emerson, The System of Freedom of Expression, 329 (1970)). *Cf. Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) ("the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.")

The government argues that the standard announced in *Kelner* is "far more stringent" than the governing standard in the Sixth Circuit. For the Sixth Circuit "true threat" standard, the government refers the Court to *United States v. Lincoln*, 462 F.2d 1368, *cert. denied*, 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). In citing *Lincoln* for the "true threat" standard, the government confuses the constitutional "true threat" requirement with the statutory intent requirement. In relevant part, *Lincoln* reads:

> This Court therefore construes *the willfulness requirement of the statute* to require only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of the President, and that the statement not be the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Lincoln*, 462 F.2d at 1368 (quoting and adopting standard from *Roy v. United States*, 416 F.2d 874, 877–78 (9th Cir.1969)) (emphasis added). *Lincoln* addresses the statute's intent requirement, and adopts the Ninth Circuit's formulation of the intent required.[12] It does not speak to the constitutional "true threat" requirement imposed by the First Amendment and elucidated in *Watts* and *Kelner*. *United States v. Glover*, 846 F.2d 339, 343–44 (6th Cir.), *cert. denied*, 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988) and *United States v. Vincent*, 681 F.2d 462, 464 (6th Cir.1982), also cited by the government, quote the same language from *Roy* and also address the statutory intent requirement rather than the constitutional limits of the statute. None of these cases indicate that a different constitutional standard for prosecution under § 875(c) applies in the Sixth Circuit than in the Second Circuit.[13]

---

**12.** *Lincoln* and *Roy* specifically address the statute barring threats against the President, 18 U.S.C. § 871(a). While cases under 18 U.S.C. § 871(a) are helpful to analyzing a prosecution under 18 U.S.C. § 875(c), there is a significant difference between the two statutes in that there is never any doubt under the former statute that

the alleged threat has a sufficiently specific target.

**13.** The Court's following *Kelner's* analysis assures that what is a crime in Michigan, Ohio, Kentucky, and Tennessee is also a crime in New

The confusion between the two requirements is understandable, because the phrase "true threat" has been used in the context of both requirements. Both the Ninth and Seventh Circuits have stated that the government must meet the *Roy* general intent standard in order to make out a "true threat." *Melugin v. Hames*, 38 F.3d 1478, 1484 (9th Cir.1994) (under Alaska statute AS 11.56.510(a)(1)); *United States v. Khorrami*, 895 F.2d 1186, 1193 (7th Cir.), *cert. denied*, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990). That the phrase "true threat" has been used to describe both the statutory intent requirement and the constitutional "unconditional, unequivocal, immediate and specific" requirement does not imply that the two requirements are identical, or that any statement which meets the intent requirement may be prosecuted under § 875(c) without running afoul of the First Amendment. Typically, in the cases focussing on the intent requirement, there is no dispute that the statement satisfies the constitutional standard, and the defendant seeks dismissal or reversal of his conviction on the ground that he or she lacked the requisite intent. *See, e.g., United States v. Lincoln*, 462 F.2d at 1369 ("[a]ppellant contends that the statute is violated only when a threat is uttered with a willful intent to carry it out."); *United States v. Hoffman*, 806 F.2d 703, 712 (7th Cir.1986) (concluding that "it was reasonable for the jury to conclude that Hoffman intended the letter as a serious expression of his intent to harm the President.") (quoted in *Khorrami*, 895 F.2d 1186).[14]

*Kelner*'s standard for a prosecution under 18 U.S.C. § 875(c) is not only constitutionally required, but also is consistent with the statute's legislative history. The law which was eventually codified as 18 U.S.C. § 875(c) was first passed in 1932, Pub.L. No. 72–274 (1932), and criminalized use of the mail to transmit a threat to injure or kidnap any person (or to injure a person's property or reputation), or to accuse a person of a crime or demand ransom for a kidnapped person. *Id.* The communication had to be sent "with intent to extort ... money or any thing of value" to fall under the act. *Id.* A motivating factor for passage of the 1932 act was the kidnapping of Charles Lindbergh's son, and the concomitant use of the mail to convey the kidnappers' threats and demands. H.R.Rep. No. 602, 72d Congress, 1st Sess. (1932).

The act was addressed to the constitutionally unproblematic case, like the Lindbergh case, identified in *Kelner*: "where a communication has become 'so interlocked with violent conduct as to constitute for all practical purposes part of the [proscribed] action itself.'" *Kelner*, 534 F.2d at 1027. The act was modified in 1934, Pub.L. No. 73–231 (1934), as increasingly sophisticated criminals had taken to using means other than the mail, such as the telephone and telegraph, to transmit their threats. S.Rep. No. 1456, 73d Congress, 2d Sess. (1934). As modified, it applied to threats transmitted "by any means whatsoever," but still required extortionate intent. Pub.L. No. 73–231 (1934). In 1939 the act, Pub.L. No. 76–76 (1939), was expanded to apply to threats to kidnap or injure that were not made with extortionate intent. *Id.* The act's expansion was prompted by the recognition that many threats "of a very serious and socially harmful nature" were not covered by the existing law because "the sender of the threat did not intend to extort money or other thing of value for himself." H.R.Rep. No. 102, 76th Congress, 1st Sess. (1939). An example of such a threat mentioned in the in the Report was one directed to a governor, threatening to blow up the governor's home if certain defendants in a criminal case were not released. As modified, while an "extortionate" intent was no

---

York, Connecticut, and Vermont. Seemingly, the government would have it otherwise.

**14.** In some cases it is unclear whether the defendant's argument goes to his or her intent or to the content of the statement. *See Melugin v. Hames*, 38 F.3d at 1484 (analyzing defendant's claim that his letter was not a "true threat" because it was "one of perhaps hundreds of 'crackpot communications' ... receive[d] each year from frustrated and/or unschooled litigants.") If *Melugin* stands for the proposition that any statement which meets the *Roy* intention standard is constitutionally prosecutable, the Court declines to follow it. The Sixth Circuit has not so held, and in *Twine*, 853 F.2d at 680, the Ninth Circuit explicitly held that conviction under § 875(c) required a showing of specific intent.

longer required, the act was still intended to address threats aimed at accomplishing some coercive purpose, such as the release of the defendants in the given example. The modified statute still targets threats which, like the example, are unlikely to offend the constitutional standard articulated in *Kelner.*

Threats aimed at achieving some coercive end remain the typical subject of more contemporary cases. In *Cox,* for instance, the defendant's truck was repossessed while it contained items of his personal property. The defendant telephoned the bank that had had the truck repossessed and stated "I tell you what, you all better have my personal items to me by five o'clock today or it[']s going to be a lot of hurt people there." *Cox,* 957 F.2d at 265. The threat was designed to effect the return of the defendant's property, it targeted the people at the bank, and it was found not to be conditional (in part because his property could not have been returned by the five o'clock deadline). It falls within *Kelner*'s requirement of a threat that is "so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." 534 F.2d at 1027.

Similarly, in *Schroeder,* the defendant had sued the government for denial of employment preference under a veterans benefit program. 902 F.2d at 1470. After losing his civil suits, the defendant called an Assistant United States Attorney and threatened to shoot people at a post office if he did not obtain satisfaction from the government; he stated that "the government either gives [him] money or people would get hurt." *Id.* *Schroeder* involves an explicitly extortionate threat aimed at people in post offices. Although the case appears to strain the constitutional standard, particularly with regard to the requirement of immediacy, the defendant did not raise a constitutional challenge on appeal.

■ While coercive or extortionate threats are paradigmatic subjects of a prosecution under 18 U.S.C. § 875(c), a threat which is neither coercive nor extortionate may still satisfy the constitutional test from *Kelner;* indeed, *Kelner* itself involved a non-coercive threat to assassinate the PLO leader Yasser Arafat. *Kelner,* 534 F.2d at 1025. *See also, DeAndino,* 958 F.2d at 146 (regarding threat that defendant was going to "blow [the victim's] brains out," and the victim was "going to die.") Nevertheless, a coercive or extortionate threat is particularly likely to be a constitutionally prosecutable "true threat" because it is particularly likely to be intimately bound up with proscribed activity.

■ Another important factor in analyzing a threat under 18 U.S.C. § 875(c) is the recipient of the communication in question. As the Sixth Circuit stated in *Lincoln* (in the context of § 871(a)), the statutory general intent element requires that "a reasonable person would foresee that the statement would be interpreted *by those to whom the maker communicates the statement* as a serious expression of an intent to inflict bodily harm" or kidnap a person. 462 F.2d at 1368. Thus in *Cox,* the Sixth Circuit looked to the reaction of the recipient of the defendant's telephone call, as well as that of the person to whom the defendant asked to speak.[15] *Cox,* 957 F.2d at 266. In *Schroeder,* the appropriate focus in considering the defendant's statements is how they would be interpreted by the Assistant United States Attorney who heard them, and by those to whom we could foreseeably relay them. A statement which would not be interpreted by any foreseeable recipient as expressing a serious intention to injure or kidnap simply is not a threat under the statute. While it is not necessary that the statement prosecuted under 18 U.S.C. § 875(c) be communicated to the would-be target of the alleged threat, the statement must be evaluated in light of foreseeable recipients of the communication.

Evaluating a statement charged under 18 U.S.C. § 875(c) in light of its foreseeable recipients is consistent with the aims of the statute and the First Amendment. In the case of a coercive or extortionate threat, the maker of the statement obviously cannot achieve his or her end if the recipient of the

---

**15.** Although the court in *Cox* looked to the actual reaction of the recipient of the phone call and the requested person, the statute only requires that a reasonable person would expect the recipient to interpret the statement as a serious expression of an intention to injure or kidnap.

statement does not take it as expressing a serious intention to carry out the threatened acts. If the coercive or extortionate threat is likely to be taken seriously by its recipient, then the threat is "so interlocked with violent conduct as to constitute for all practical purposes part of the [proscribed] action itself." *Kelner*, 534 F.2d at 1027. A communication containing an alleged non-coercive threat may be regulated consonant with the First Amendment, under the analysis in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305, 321 (1992), in order to "protect[ ] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." If the alleged threat would not be interpreted by its foreseeable recipients as a serious expression of an intention to do the "threatened" acts, it does not implicate fear of violence or the disruption that fear engenders, and does not suggest a real possibility that the "threatened" violence will occur. The statement thus would not be a "true threat" for the purposes of the First Amendment.

▬ Whether or not a prosecution under § 875(c) encroaches on constitutionally protected speech is a question appropriately decided by the Court as a threshold matter. In the context of the Smith Act, 18 U.S.C. § 2381 *et seq.*, which makes it a crime knowingly or willfully to advocate the overthrow or destruction of the United States government by force or violence, the Supreme Court has held that "[w]hen facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law" requiring a judicial determination. *Dennis v. United States*, 341 U.S. 494, 513, 71 S.Ct. 857, 869, 95 L.Ed. 1137 (1951) (construing Act as codified at 18 U.S.C. (1946 ed.) § 11, 54 Stat. 671). In the context of § 875(c), the Second Circuit has recognized that "[m]ost cases are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury," but has said that where the factual proof of a " 'true' threat" is "insufficient as a matter of law," the indictment is properly dismissed before reaching the jury. *United States v. Carrier*, 672 F.2d 300, 306 (2d Cir.), *cert. denied*, 457

U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Although the government argues that "whether a statement is a true threat is to be decided by the trier of fact," it recognizes that where "the language set forth ... is so facially insufficient that it cannot possibly amount to a true threat," the Court may properly dismiss the indictment. *Id.; accord Kosma*, 951 F.2d at 555; *United States v. Gilbert*, 884 F.2d 454, 458 (9th Cir.1989), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990); *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir.1983), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *Lincoln*, 589 F.2d at 382. Whether the language set forth in the superseding indictment could possibly constitute a "true threat" must be determined in accord with *Kelner*'s articulation of the constitutional requirement of a

> threat which on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

*Kelner*, 534 F.2d at 1027. Whether or not Baker actually intended to carry out the actions described in the communications is irrelevant to the constitutional inquiry.

### IV. The Communications

The government characterizes the e-mail dialogue between Gonda and Baker in December, 1994 as reflecting "the evolution of their activity from shared fantasies to a firm plan of action." The government's characterization of the ongoing dialogue suggests that at least some of the counts in the superseding indictment should be dismissed; messages constituting "shared fantasies" fall short of the *Kelner* standard of an unequivocal, unconditional, immediate and specific threat conveying an imminent prospect of execution and therefore are not "true threats" unprotected by the First Amendment.

▬ As the Court construes the law as discussed above, the constitutional standard enunciated in *Kelner* requires, at the very least, that a statement charged under

§ 875(c) contain some language construable as a serious expression of an intent imminently to carry out some injurious act. The language of the statement must be considered as it would be interpreted by the foreseeable recipients of the communication containing it. Statements expressing musings, considerations of what it would be like to kidnap or injure someone, or desires to kidnap or injure someone, however unsavory, are not constitutionally actionable under § 875(c) absent some expression of an intent to commit the injury or kidnapping.[16] In addition, while the statement need not identify a specific individual as its target, it must be sufficiently specific as to its potential target or targets to render the statement more than hypothetical.

Before addressing the specific language quoted in the indictment, several observations pertain to all of the government's charges. First, all of the language for which Baker is charged was contained in private e-mail messages he sent to Gonda. The messages were not available in any publicly accessible part of the Internet, and there is no allegation that they were ever distributed in any format, electronic or hardcopy, to anyone other than Gonda. Nothing in these private messages suggests that they would be further distributed. It is only as a result of this prosecution and the ensuing publicity that the content of the messages has been publicly aired.

The focus of the inquiry here, therefore, is how a reasonable person would expect Gonda to interpret the e-mail messages. Gonda's identity is entirely unknown; "he" could be a ten year old girl, an eighty year old man, or a committee in a retirement community playing the role of Gonda gathered around a computer.[17] All that is known about Gonda is that he used a computer account based in Ontario, Canada, and that he apparently enjoyed exchanging with Baker what he referred to in an e-mail message dated January 3, 1995, as "REAL sex talk" concerning violence against women and girls. The language referred to by the government clearly does not constitute threats of a coercive or extortionate nature. It would be patently unreasonable after reading his messages to think that Baker's communications caused their only foreseeable recipient, Gonda, to fear violence, or caused him any disruption due to fear of violence. Of the grounds for prosecution of threats identified in *R.A.V.*, the only one that could apply here is protection from the possibility that threatened violence will occur. 505 U.S. at 388, 112 S.Ct. at 2546, 120 L.Ed.2d at 321.

■ The government characterizes the communications between Gonda and Baker as evolving into "a firm plan of action." Section 875(c), though, does not address planning crimes, per se, but transmitting threats to injure or kidnap. At oral argument, the government agreed the exchange between Gonda and Baker could be characterized as an exchange between coconspirators. In order to prove the existence of a conspiracy, generally, the government must prove an agreement between two or more people to act together in committing an offense, and also an overt act in furtherance of the conspiracy. *E.g., United States v. Reifsteck*, 841 F.2d 701, 704 (6th Cir.1988); 18 U.S.C. § 371; Sixth Circuit Pattern Criminal Jury Instructions 3.01A, 3.04. The charges here could not support a conspiracy prosecution because no overt act is alleged. The only actions involved in this prosecution are speech—"the outward expression of what a person thinks in his mind." *Vance v. Judas Priest, et al.*, 1990 WL 130920, *28 (Nev.Dist. Ct.1990). In an e-mail exchange not quoted

---

**16.** This test is not satisfied by finding that the desires expressed in a statement are so deviant that the person making the statement must be unstable, and therefore likely to act in accordance with his or her desires at any moment. Something in the statement itself must indicate some intention imminently to act. Otherwise, the statement may be unsettling or alarming, but is not a true threat for the purposes of the First Amendment.

**17.** Role playing and adopting assumed identities is common in on-line communities. *See, e.g.*, Dorion Sagan, *Sex, Lies, and Cyberspace*, Wired, Jan. 1995, at 78 (discussing the multiple, and differently gendered, identities assumed by the author on the commercial service America Online—and subtitled "Online, no one knows you're a dog. Or a male. Or a 13–year–old girl.")

in the superseding indictment,[18] Baker and Gonda discuss sharing their thoughts, a classically protected activity. Baker had said to Gonda, in part: "I'd love to meet with you. There's no one else I can share my thoughts with." On November 29, 1994, Gonda responded in part: "I would really love to meet with you. I find that I am going insane trying to keep all these thoughts to myself ... maybe we could even try to pick up some chicks and share our thoughts with them ... what do you think?"

Even if Gonda and Baker were conspiring, it does not follow that they are guilty of transmitting a threat to injure or kidnap under 18 U.S.C. § 875(c). Section 875(c) is not simply a conspiracy statute minus the overt act requirement. In order to be constitutionally sanctionable, the statements Baker made must meet *Kelner*'s "unequivocal, unconditional, immediate, and specific" standard. As Justice Brandeis wrote:

> Fear of serious injury cannot alone justify suppression of free speech ... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent.

*Whitney v. California*, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).[19]

### A.

Count I charges Baker and Gonda with transmitting a threat to injure, and quotes from three e-mail messages. In the first message quoted, dated December 1, 1994, Baker responds to a message he had received from Gonda:

I highly agree with the type of woman you like to hurt. You seem to have the same tastes I have. When you come down, this'll be fun!

Also, I've been thinking. I want to do it to a really young girl first. !3 or 14.[20] There innocence makes them so much more fun—and they'll be easier to control. What do you think? I haven't read your entire mail yet. I've saved it to read later, in private. I'll try to write another short phantasy and send it. If not tomorrow, maybe by Monday. No promises.

On December 2, Gonda responded:

I would love to do a 13 or 14 year old. I think you are right ... not only their innocence but their young bodies would really be fun to hurt. As far as being easier to control ... you may be right, however you can control any bitch with rope and a gag ... once tey are tieed up and struggling we could do anything we want to them ... to any girl. The trick is to be very careful in planning. I will keep my eye out for young girls, and relish the fantasy ... BTW [21] how about your neighbour at home, youm may get a chance to see her ...? ...?

The same day, Baker responded:

True. But young girls still turn me on more. Likely to be nice and tight. Oh. they'd scream nicely too!

Yeah. I didn't see her last time I was home. She might have moved. But she'd be a great catch. She's real pretty. with nice long legs. and a great girly face ... I'd love to make her cry ...

The bill of particulars identifies the targets of these statements as:

13 or 14–year old girls who reside in Defendant Jake Baker's neighborhood in Ann

---

18. Baker and Gonda exchanged at least forty-one messages between November 29, 1994 and January 25, 1995. During the same time frame, Baker also corresponded by e-mail with other people who had read the stories he publicly posted.

19. The Senate's recent passage of a telecommunications bill including Senator Exon's measure criminalizing the distribution of "filthy" material over computer networks suggests that the First Amendment's applicability to on-line communi-

cations has not been well considered. S. 652, 104th Congress, 1st Sess. (1995); *see also*, Edmund L. Andrews, *Senate Supports Severe Penalties on Computer Smut*, N.Y. Times, June 15, 1995, at A1.

20. The typographic, spelling, and grammatical errors in this and the following quotations are reproduced from the originals.

21. "BTW" is shorthand for "by the way."

Arbor, Michigan, and teenage girls who reside in Defendant Jake Baker's neighborhood in Boardman, Ohio.

This Count falls short of the constitutional "true threat" requirement. As an initial matter, it does not refer to a sufficiently specific class of targets. The more limited class identified in the bill of particulars is not apparent from the face of the communications. Nothing in the exchange quoted in Count I implicitly or explicitly refers to 13 or 14 year old girls *in Ann Arbor*, nothing in the exchange identifies Boardman, Ohio (Baker's actual home) as the "home" referred to, and nothing in the exchange allows one to determine that the neighbor discussed is a teen-age girl. In reality, the only class of people to whom the messages can be taken to refer is 13 or 14 year old girls, anywhere. This class is too indeterminate to satisfy *Kelner*'s requirement of specificity as to the person threatened, even under the liberal interpretation given the requirement by some courts. *Cf. Schroeder*, 902 F.2d at 1470 (targeting people at an unidentified post office).

As to the content of the messages, Baker's discussing his "tastes" in the first paragraph of his December 1 message does not involve any identifiable threatened action. In the second paragraph of the December 1 message, he expresses a desire "to do it to" a 13 or 14 year old girl. Even assuming that more context would clarify the phrase "to do it to," the second paragraph also fails to mention an intention to do anything. Rather, it seeks Gonda's reaction to Baker's desire, asking: "What do you think?" Discussion of desires, alone, is not tantamount to threatening to act on those desires. Absent such a threat to act, a statement is protected by the First Amendment.

As to Baker's message of December 2, the first paragraph again discusses a predilection toward "young girls," and what it would be like, presumably, "to do it to" "young girls." It does not mention any intention to act in accordance with the expressed predilection. The second paragraph responds to Gonda's question about a neighbor "at home." It says "she'd be a great catch," but expresses no intention to "catch" her, and indicates a

desire to "make her cry," but, again, expresses no intention to take any action in accordance with that desire. It is not constitutionally permissible under *Kelner* to infer an intention to act on a desire from a simple expression of the desire. The intention (whether or not actually held) must itself be expressed in the statement. Count I fails to meet this standard, and must be dismissed.

### B.

Counts II and III are based on the same statement made by Baker in an e-mail message dated December 9, 1994, and charge Baker with making a threat to kidnap and a threat to injure, respectively. The statement for which Baker is charged in the two counts reads:

> I just picked up Bllod Lust and have started to read it. I'll look for "Final Truth" tomorrow (payday). One of the things I've started doing is going back and re-reading earlier messages of yours. Each time I do. they turn me on more and more. I can't wait to see you in person. I've been trying to think of secluded spots. but my knowledge of Ann Arbor is mostly limited to the campus. I don't want any blood in my room, though I have come upon an excellent method to abduct a bitch—

> As I said before, my room is right across from the girl's bathroom. Wiat until late at night. grab her when she goes to unlock the dorr. Knock her unconscious. and put her into one of those portable lockers (forget the word for it). or even a duffle bag. Then hurry her out to the car and take her away ... What do you think?

The bill of particulars identifies the target of the statement as: "Female college students who lived in Defendant Jake Baker's dormitory at the University of Michigan in Ann Arbor, Michigan." Apart from concerns about equating Baker's online persona with his real person, the class of would-be targets here is identified with sufficient specificity.

Presumably, the government offers this statement as a threat to carry out the "method to abduct" it describes. Under *Kelner*, discussion of a method of kidnapping or injuring a person is not punishable unless

the statement includes an unequivocal and specific expression of intention immediately to carry out the actions discussed. Baker's e-mail message cannot reasonably be read as satisfying this standard. As in Count I, the language with which Baker is charged here lacks any expression of an intention to act, and concludes with a request for Gonda's reaction: "What do you think?" Discussing the commission of a crime is not tantamount to declaring an intention to commit the crime. To find an expression of unequivocal intention in this language would require the drawing of an inference not grounded in any specific language of the statement and would exceed the bounds of the First Amendment. Counts II and III must be dismissed.

### C.

█ Count IV charges Baker and Gonda with transmitting a threat to injure. The Count is based on a message from Gonda to Baker, and Baker's response. Both e-mail messages are dated December 10, 1994. Gonda wrote:

> Hi Jake. I have been out tonight and I can tell you that I am thinking more and more about 'doing' a girl. I can picture it so well ... and I can think of no better use for their flesh. I HAVE to make a bitch suffer!
>
> As far as the Teale-homolka killings, well I can think of no tastier crimes ... BTW have you seen any pictures of the girls? You have to see these cunts! They must have been so much fun ... please let me know any details that I cannot get here. I would love to see what you think about it. . . .
>
> As far as the asian bitch story, there is only one possible ending. . . .

Baker responded:

> Are tastes are so similar. it scares me :-) When I lay down at night. all I think of before I sleep is how I'd torture a bitch I get my hands on. I have some pretty vivid near dreams too. I wish I could remember them when I get up.

The bill of particulars identifies the target of these statements as:

> Women who were the subject of Defendant Jake Baker's E-mail transmissions and In-

ternet postings, including—but not limited to—Jane Doe, whose true name is known to Defendant Jake Baker and this Honorable Court.

This Count presents the weakest of all the government's charges against Baker. While the government identifies the class of targets here as women Baker discussed on the Internet, there is nothing in the language quoted here to so limit the class. In addition, since Baker's e-mail often refers simply to "a girl," a class composed of women Baker discussed in his e-mail and stories essentially is a class composed of any woman or girl about whom Baker has ever thought. Such a class is obviously not sufficiently specific.

█ With regard to the content of Baker's communication, Baker's statement here consists only of an expression of his thoughts before sleeping and of "near dreams" he cannot remember upon waking. To infer an intention to act upon the thoughts and dreams from this language would stray far beyond the bounds of the First Amendment, and would amount to punishing Baker for his thoughts and desires. Count IV must be dismissed.

### D.

█ Count V charges Baker and Gonda with transmitting a threat to injure. It is based on an exchange between Gonda and Baker on December 11–12, 1994. On December 11, Gonda wrote to Baker:

> It's always a pleasure hearing back from you ... I had a great orgasm today thinking of how you and I would torture this very very petite and cute south american girl in one of my classes ... BTW speaking of torture, I have got this great full length picture of the Mahaffy girl Paul Bernardo killed, she is wearing this short skirt!

The same day, Baker responded:

> Just thinking about it anymore doesn't do the trick ... I need TO DO IT.

The next day, Gonda wrote:

> My feelings exactly! We have to get together ... I will give you more details as soon as I find out my situation ...

Baker responded:

> Alrighty then. If not next week. or in January. then definatly sometime in the

Summer. Pickings are better then too. Although it's more crowded.

The bill of particulars identifies the target of these statements, as in Count IV, as:

Women who were the subject of Defendant Jake Baker's E-mail transmissions and Internet postings, including—but not limited to—Jane Doe, whose true name is known to Defendant Jake Baker and this Honorable Court.

This Count, too, fails to meet *Kelner*'s constitutional "true threat" standard. The class of potential targets, as discussed with regard to Count IV, is far too vague. As to the content of the communications, Baker indicates his "need TO DO IT." Like his earlier statements, this language indicates a desire to do something. While use of the word "need" indicates a strong desire, it still falls short "unequivocal, unconditional and specific expression of intention immediately to inflict injury," *Kelner*, 534 F.2d at 1027; "needs" go unmet everyday. Baker next indicates, at most, an intention to meet Gonda at some indefinite point in the future—in the next week, month, or several months later. This statement does not express an unequivocal intention immediately to do anything. Also, nothing in the language on which the Count is based indicates any intention to commit specific acts if Baker and Gonda ever were to meet. Like the preceding four Counts, Count V fails to state a charge under § 875(c) that can survive a First Amendment challenge, and must be dismissed. This prosecution presents the rare case in which, in the government's words, "the language set forth ... is so facially insufficient that it cannot possibly amount to a true threat."

## V. Coda

This case in its initial stage generated a good deal of public interest.[22] Now that the case will be concluded by an order rather than by a jury verdict, it is important to assure the public that such a conclusion is not by fiat. In *United States v. Carrier*, 672

F.2d 300, 306 (2d Cir.), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982), while the Second Circuit said "that whether words used are a true threat is generally best left to the triers of fact," it went on to say "[o]nly where the factual proof is insufficient as a matter of law should the indictment be dismissed." This is such a case. The communications which form the basis of the superseding indictment, the many preceding and subsequent communications, the names of the witnesses and the general nature of their testimony, and the exhibits are all in the record. All of this evidence, viewed in the light most favorable to the prosecution, leads to one inevitable conclusion: based on the applicable rules of law there is no case for a jury because the factual proof is insufficient as a matter of law. The government's enthusiastic beginning petered out to a salvage effort once it recognized that the communication which so much alarmed the University of Michigan officials was only a rather savage and tasteless piece of fiction. Why the government became involved in the matter is not really explained in the record.[23]

Baker is being prosecuted under 18 U.S.C. § 875(c) for his use of words, implicating fundamental First Amendment concerns. Baker's words were transmitted by means of the Internet, a relatively new communications medium that is itself currently the subject of much media attention. The Internet makes it possible with unprecedented ease to achieve world-wide distribution of material, like Baker's story, posted to its public areas. When used in such a fashion, the Internet may be likened to a newspaper with unlimited distribution and no locatable printing press—and with no supervising editorial control. But Baker's e-mail messages, on which the superseding indictment is based, were not publicly published but privately sent to Gonda. While new technology such as the Internet may complicate analysis and may sometimes require new or modified laws,[24] it does not in this instance qualitatively change the analysis under the statute or under the First Amendment. Whatever Baker's faults,

**22.** *See* note 3, *supra*.

**23.** *See* note 4, *supra*.

**24.** As is discussed above, the law now codified at 18 U.S.C. § 875 was revised in 1934, Pub.L. No. 72–274, as telephones and telegraphs began to be used to transmit threats.

and he is to be faulted, he did not violate 18 U.S.C. § 875(c). The case would have been better handled as a disciplinary matter, as the University of Victoria proceeded in a similar situation,[25] despite whatever difficulties inhere in such a course.[26] What the Court said at the conclusion of oral argument bears repeating: "[T]he Court is very skeptical, and about the best thing the government's got going for it at this moment is the sincerity of purpose exhibited by [the Assistant United States Attorneys prosecuting the case]. I am not sure that sincerity of purpose is either synonymous with a good case under the law, or even the exercise of good judgment."

**25.** *See Robin Blaber v. University of Victoria* (March 14, 1995) Victoria 94–4823 (BCSC) (dismissing student's free speech challenge to University of Victoria's potential revocation of his computer account).

**26.** *See Doe v. University of Michigan,* 721 F.Supp. 852 (E.D.Mich.1989) (striking down University of Michigan harassment policy of First Amendment grounds).