**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Abraham Jacob ALKHABAZ, also known
as Jake Baker, Defendant–Appellee.**

No. 95–1797.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 16, 1996.

Decided Jan. 29, 1997.

Kenneth R. Chadwell, Jr. (briefed), Christopher P. Yates (argued and briefed), Saul A. Green (briefed), Office of the U.S. Attorney, Detroit, MI, for Plaintiff–Appellant.

Douglas R. Mullkoff (argued and briefed), F. Mark Hugger, Ann Arbor, MI, for Defendant–Appellee.

Catherine A. MacKinnon (briefed), Ann Arbor, MI, for National Coalition Against Sexual Assault, Amicus Curiae.

Paul J. Denenfeld (briefed), Edward M. Wise, Detroit, MI, for ACLU Fund of Michigan, Amicus Curiae.

Before: MARTIN, Chief Judge, and KRUPANSKY and DAUGHTREY, Circuit Judges.

MARTIN, C.J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KRUPANSKY, J. (pp. 1496–1507), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Chief Judge.

Claiming that the district court erred in determining that certain electronic mail messages between Abraham Jacob Alkhabaz, a.k.a. Jake Baker, and Arthur Gonda did not constitute "true threats," the government appeals the dismissal of the indictment charging Baker with violations of 18 U.S.C. § 875(c).

From November 1994 until approximately January 1995, Baker and Gonda exchanged e-mail messages over the Internet, the content of which expressed a sexual interest in violence against women and girls. Baker sent and received messages through a computer in Ann Arbor, Michigan, while Gonda—whose true identity and whereabouts are still unknown—used a computer in Ontario, Canada.

Prior to this time, Baker had posted a number of fictional stories to "alt.sex.stories," a popular interactive Usenet news group. Using such shorthand references as "B & D," "snuff," "pedo," "mf," and "nc," Baker's fictional stories generally involved the abduction, rape, torture, mutilation, and murder of women and young girls. On January 9, Baker posted a story describing the torture, rape, and murder of a young woman who shared the name of one of Baker's classmates at the University of Michigan.

On February 9, Baker was arrested and appeared before a United States Magistrate Judge on a criminal complaint alleging violations of 18 U.S.C. § 875(c), which prohibits interstate communications containing threats to kidnap or injure another person. The government made the complaint based on an FBI agent's affidavit, which cited language from the story involving Baker's classmate. The Magistrate Judge ordered Baker detained as a danger to the community and a United States District Court affirmed his detention. Upon Baker's motion to be released on bond, this Court ordered a psychological evaluation. When the evaluation concluded that Baker posed no threat to the community, this Court ordered Baker's release.

On February 14, a federal grand jury returned a one-count indictment charging Baker with a violation of 18 U.S.C. § 875(c). On March 15, 1995, citing several e-mail messages between Gonda and Baker, a federal grand jury returned a superseding indictment, charging Baker and Gonda with five counts of violations of 18 U.S.C. § 875(c). The e-mail messages supporting the superseding indictment were not available in any publicly accessible portion of the Internet.

On April 15, Baker filed a Motion to Quash Indictment with the district court. In *United States v. Baker*, 890 F.Supp. 1375, 1381 (E.D.Mich.1995), the district court dismissed the indictment against Baker, reasoning that the e-mail messages sent and received by Baker and Gonda did not constitute "true threats" under the First Amendment and, as such, were protected speech. The government argues that the district court erred in dismissing the indictment because the communications between Gonda and Baker do constitute "true threats" and, as such, do not implicate First Amendment free speech protections. In response, Baker urges this Court to adopt the reasoning of the district court and affirm the dismissal of the indictment against him.

Neither the district court's opinion, nor the parties' briefs contain any discussion regarding whether Baker's e-mail messages initially satisfy the requirements of Section 875(c). For the reasons stated below, we conclude that the indictment failed, as a matter of law, to allege violations of Section 875(c). Accordingly, we decline to address the First Amendment issues raised by the parties.

An indictment is sufficient if it "set[s] forth the offense in the words of the statute itself, as long as 'those words ... fully, directly, and expressly ... set forth all the elements necessary to constitute the offense *intended* to be punished.'" *United States v. DeAndino*, 958 F.2d 146, 147 (6th Cir.1992) (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974) (emphasis added)), *cert.*

*denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992). Accordingly, in determining the sufficiency of the indictment against Baker, we must consider the elements of the offense that Congress intended to prohibit when it created Section 875(c). Because Congress's intent is essentially a question of statutory interpretation, we review the district court's decision *de novo. United States v. Spinelle,* 41 F.3d 1056, 1057 (6th Cir.1994); *United States v. Brown,* 915 F.2d 219, 223 (6th Cir.1990).

■ Title 18, United States Code, Section 875(c) states:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

The government must allege and prove three elements to support a conviction under Section 875(c): "(1) a transmission in interstate [or foreign] commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure [or kidnap] the person of another." *DeAndino,* 958 F.2d at 148. In this case, the first and third elements cannot be seriously challenged by the defendant. However, the second element raises several issues that this Court must address. As this Court has recognized, "[i]t is one of the most fundamental postulates of our criminal justice system that conviction can result only from a violation of clearly defined standards of conduct." *United States v. Monasterski,* 567 F.2d 677, 683 (6th Cir.1977). Indeed, "[o]ur law does not punish bad purpose standing alone, however; instead we require that mens rea accompany the actus reus specifically proscribed by statute." *Id.* As the Supreme Court has recognized, William Shakespeare's lines here illustrate sound legal doctrine.

> His acts did not o'ertake his bad intent;
> And must be buried but as an intent
> That perish'd by the way: thoughts are no subjects,
> Intents but merely thoughts.

*United States v. Apfelbaum,* 445 U.S. 115, 131 n. 13, 100 S.Ct. 948, 957 n. 13, 63 L.Ed.2d 250 (1980) (quoting William Shakespeare's Measure for Measure, Act V, Scene 1; G. Williams, Criminal Law, The General Part 1 (2d ed. 1961)).

■ Although its language does not specifically contain a mens rea element, this Court has interpreted Section 875(c) as requiring only general intent. *DeAndino,* 958 F.2d at 148–50. Accordingly, Section 875(c) requires proof that a reasonable person would have taken the defendant's statement as "a serious expression of an intention to inflict bodily harm." *Id.* at 148 (citing *United States v. Lincoln,* 462 F.2d 1368, 1369 (6th Cir.1972)).

Additionally, Section 875(c) does not clearly define an actus reus. The language of Section 875(c) prohibits the transmission of "any communication containing any threat to kidnap any person or any threat to injure the person of another." However, in *United States v. Bellrichard,* 779 F.Supp. 454, 459 (D.Minn.1991), *aff'd,* 994 F.2d 1318 (8th Cir. 1993), a Minnesota district court recognized the absurdity of a literal interpretation of this language in the context of Section 876, the companion statute of Section 875(c).

> The statute should not be interpreted to cover every letter which, apart from its context, seems to threaten a person other than the addressee or letter recipient, as the government argues. For example, if a prosecutor mailed defendant's letters to another government official for analysis or review, that conduct could be covered by the statute—mailing a threat to injure the person of another. Similarly, if the court mails this opinion to West Publishing Company, having quoted verbatim the language used by defendant which is alleged to be threatening, that conduct could be covered by the statute. Also covered would be conduct of a member of the general public, who, attending this trial of widespread interest, took notes of defendant's statements and mailed them to a family member, law professor, or newspaper for their information.

The *Bellrichard* court concluded that such contingencies could be avoided by requiring that proscribable threats be communicated either to the threatened individual, or to a

third party with "some connection" to the threatened individual.

We agree with the district court in *Bellrichard* that a literal interpretation of Section 875(c) would lead to absurd results not intended by Congress. However, instead of applying a test that requires "some connection," the unintended results noted in *Bellrichard* may be avoided simply by considering the type of offense that Congress intended to prohibit when it enacted Section 875(c).

To determine what type of action Congress intended to prohibit, it is necessary to consider the nature of a threat. At their core, threats are tools that are employed when one wishes to have some effect, or achieve some goal, through intimidation. This is true regardless of whether the goal is highly reprehensible or seemingly innocuous.

For example, the goal may be extortionate or coercive. In *United States v. Cox,* 957 F.2d 264 (6th Cir.1992), a bank repossessed the defendant's vehicle, including several personal items. The defendant then telephoned the bank and threatened to "hurt people" at the bank, unless the bank returned his property. Similarly, in *United States v. Schroeder,* 902 F.2d 1469 (10th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 181, 112 L.Ed.2d 145 (1990), the defendant informed an Assistant United States Attorney that "people would get hurt" if the government did not give him money. In both cases, the defendant used a threat in an attempt to extort property from the threatened party.

Additionally, the goal, although not rising to the level of extortion, may be the furtherance of a political objective. For example, in *United States v. Kelner,* 534 F.2d 1020 (2d Cir.1976), the defendant threatened to assassinate Yasser Arafat, leader of the Palestine Liberation Organization (PLO), during a news conference. Kelner claimed that his sole purpose in issuing the threat was to inform the PLO that "we (as Jews) would defend ourselves and protect ourselves." *Id.* at 1021–22. Although Kelner's threat was not extortionate, he apparently sought to further the political objectives of his organization by intimidating the PLO with warnings of violence.

Finally, a threat may be communicated for a seemingly innocuous purpose. For example, one may communicate a bomb threat, even if the bomb does not exist, for the sole purpose of creating a prank. However, such a communication would still constitute a threat because the threatening party is attempting to create levity (at least in his or her own mind) through the use of intimidation.

The above examples illustrate threats because they demonstrate a combination of the mens rea with the actus reus. Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation.

Accordingly, to achieve the intent of Congress, we hold that, to constitute "a communication containing a threat" under Section 875(c), a communication must be such that a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus).

The dissent argues that Congress did not intend to include as an element of the crime the furthering of some goal through the use of intimidation. Emphasizing the term "any" in the language of the statute, the dissent maintains that Congress did not limit the scope of communications that constitutes criminal threats. While we agree that Congress chose inclusive language to identify the types of threats that it intended to prohibit, we cannot ignore the fact that Congress intended to forbid only those communications that in fact constitute a "threat." The conclusion that we reach here is one that the term "threat" necessarily implies. To emphasize the use of the term "any" without acknowledging the limitations imposed by the term "threat" ignores the intent of Congress and results in the absurd conclusions identified in *Bellrichard,* 779 F.Supp. at 459.

It is important to note that we are not expressing a subjective standard. This Court has held that the mens rea element of a Section 875(c) violation must be determined objectively. *DeAndino,* 958 F.2d at 149–50. The rationale for applying an objective standard to establish the mens rea element of a Section 875(c) violation is equally as compelling with regard to establishing the actus reus element. Accordingly, for reasons expressed in *DeAndino,* the actus reus element of a Section 875(c) violation must be determined objectively, from the perspective of the receiver.

Our interpretation of the actus reus requirement of Section 875(c) conforms not only to the nature of a threat, but also to the purpose of prohibiting threats. Several other circuits have recognized that statutes prohibiting threats are designed to protect the recipient's sense of personal safety and well being. *United States v. Aman,* 31 F.3d 550 (7th Cir.1994); *United States v. Bellrichard,* 994 F.2d 1318 (8th Cir.1993); *see, e.g., R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (threats of violence are proscribable because of the fear caused by the threat, the disruption engendered by such fear, and the possibility that the threat of violence will occur). If an otherwise threatening communication is not, from an objective standpoint, transmitted for the purpose of intimidation, then it is unlikely that the recipient will be intimidated or that the recipient's peace of mind will be disturbed.

For example, under a hypothetical expressed in *Bellrichard,* "if the court mails this opinion to West Publishing Company, having quoted verbatim the language used by defendant which is alleged to be threatening," it is unlikely that any reader's sense of personal safety and well being would be jeopardized. Likewise, if "a member of the general public, who, attending this trial of widespread interest, took notes of defendant's statements and mailed them to a family member, law professor, or newspaper for their information," such communication would not, from an objective standpoint, compromise the recipient's sense of personal safety. In both cases, the recipient's sense of well-being is not endangered because, from an objective standpoint, the sender has no desire to intimidate.

■ Applying our interpretation of the statute to the facts before us, we conclude that the communications between Baker and Gonda do not constitute "communication[s] containing a threat" under Section 875(c). Even if a reasonable person would take the communications between Baker and Gonda as serious expressions of an intention to inflict bodily harm, no reasonable person would perceive such communications as being conveyed to effect some change or achieve some goal through intimidation. Quite the opposite, Baker and Gonda apparently sent e-mail messages to each other in an attempt to foster a friendship based on shared sexual fantasies.

Ultimately, the indictment against Baker fails to "set forth ... all the elements necessary to constitute the offense *intended* to be punished" and must be dismissed as a matter of law. *DeAndino,* 958 F.2d at 146 (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (emphasis added)). We agree with the district court, that "[w]hatever Baker's faults, and he is to be faulted, he did not violate 18 U.S.C. § 875(c)." *United States v. Baker,* 890 F.Supp. at 1390, 1391.

For the foregoing reasons, the judgment of the district court is affirmed.

KRUPANSKY, Circuit Judge, dissenting.

The panel majority has ruled that an interstate or international "communication containing any threat" to kidnap or injure another person is criminalized by 18 U.S.C. § 875(c) only when the subject communication was conveyed with the general intent "to effect some change or achieve some goal through intimidation." The majority concludes that because the instant indictment alleges only communications purportedly intended to foster a perverse camaraderie between the correspondents, rather than "to effect some change or realize some goal through intimidation," the indictment must be dismissed because each count fails to allege an essential element of a section 875(c) charge. Because the majority has intruded

upon Congressional prerogatives by judicially legislating an exogenous element into section 875(c) that materially alters the plain language and purpose of that section and ignores the prevailing precedents of the Supreme Court and this circuit, I respectfully dissent from the majority's decision.

Jake Baker (also known as Abraham Jacob Alkhabaz), an undergraduate student attending the University of Michigan in Ann Arbor, for some time prior to November 1994 and continuing until February 1995 was a regular contributor of sadistic fictional "short stories" intended for public dissemination and comment via a Usenet electronic bulletin board. The appellate record contains a substantial anthology of Baker's efforts. Overall, these misogynistic articles evince an extreme and morbid fascination with the concept of the physical and psychological abuse and torment of women and young girls, described in lurid detail, and often culminating in murder.[1]

1. The "Jane Doe story," which he named after an actual female classmate and which in fact is a relatively mild exemplar of the bestial genre of Baker's fiction, follows:

[LAST NAME OF A SPECIFIC FEMALE CLASSMATE OF BAKER'S OMITTED]

Prologue: The following story start [sic] in media res. The premise is that my friend Jerry and I have broken into the apartment of this girl, [FULL NAME OMITTED], whom I know from call [sic], and are porceeding [sic] to have a little fun with her. ('I' = the protagonist). Main:

She's shaking with terror as Jerry and I circle her. She'd [sic] almost completely nude now—we've made her take off all her clothes except for her bra and panties. As Jerry and I pass by her, we reach out and feel her velvety flesh, caress her breasts and ass through her underwear. Jerry and I snap pictures of her tiny trembling body from all angles.

She says in a little, terrified voice, "Why are you doing this ... I've never hurt you ... p-please stop!" I pause in front of her. Jerry smiles at her terror. He laughs at her pitiful pleas. I say, "Shut the fuck up, stupid whore!" and hit the side of her head, hard. She collapses onto the ground, crying, curling up into a little ball.

"Alright. Let's have some fun!"

I yank her up by the hair and force her hands behind her back. I quickly get them restrained with duck [sic] tape. Her little body struggles against me as she screams for help. Jerry tears off her panties and shoves them into her delicious mouth, securing them with a tight strip of rope.

She'd [sic] still struggling, screaming into the makeshift gag. I let her drop, to take pictures of her as she struggles against her bonds. As she's fighting there on the carpet, eyes wide with fear, Jerry and I strip. Jerry's got a hard on. I've got a hard on. We laugh.

I grab her bra and rip it off her. Holding her still for Jerry, he fondles her breasts, feeling up her entire body. As she moans into the gag, Jerry comments on how soft she is. I slap her face several time, enjoying the smacking sounds my hand makes against her pink skin. Forcing her to her knees, I rub my cock into her face—over her cheeks and her eyes and her nose. She turns her head, closing her eyes with the humiliation, so I shove my prick as far as it will go into her ear. Her inner cannals [sic] warm; I force it in harder, and my penis-head scrunches up to fit into the small hole, not quite making it. [FIRST NAME OMITTED] groans into her gag.

Then, Jerry and I tie her by her long brown hair to the ceiling fan, so that she's dangling in mid-air. Her feet don't touch the ground. She kicks trying to hit me, Jerry or the ground. The sight of her wiggling in mid-air, hands rudely tied behind her back, turns me on. Jerry takes a big spiky hair-brush and start [sic] beating her small breasts with it, coloring them with nice red marks. She screams and struggles harder. I've separated her legs with a spreader-bar; now I stretch out her pussy-lips and super-glue them wide open. Then I take a heavy clamp, and tighten it over her clit. Once it's tight enough, I let go.

I stand back, to take pictures. She's really nice now: Dangling by her hair (I can see where it's stretching her scalp), her breasts and belly are covered with bright red bruises. There's a heavy clamp stretching her cunt down. And best of all, her face is scrunched up in an agonized grimace. Drool and loud squeaks escape through her gag. She's so beautiful like this. Just to add to the picture, I take a steel-wire wisk and beat her ass with it, making bright red cuts that drip blood. [LAST NAME OMITTED]'s tiny pink body is now covered in sweat; nice and shiny in the light. Jerry tells me her curling-iron's ready. Jerry unplugs it and bring [sic] it over. After taking her down and tying her hunched over a chair, Jerry strokes the device against her bleeding ass cheeks. The heat from it gives her ass small burns. I smile and stroke my cock as she screams in pain and horror. She shakes her head and moans, "Nooo ... nooo" through the gag. I walk in front of her, and remove the gag. Before she can even breath in, I ram my cock in her tiny mouth. Her lips squeeze against my shaft. The head of my prick finds its way down her lovely throat. That's when Jerry ram [sic] the hot curling iron into her tight asshole. She tries to scream, but I shove my cock's [sic] down her throat, and all she manages to do is gag on it. Her throat's quiverings tickle my cock, and I

1498

By November 1994, Baker's sadistic stories attracted the attention of an individual who called himself "Arthur Gonda," [2] a Usenet service subscriber residing in Ontario, Canada, who apparently shared similarly misdirected proclivities. Baker and Gonda subsequently exchanged at least 41 private computerized electronic mail ("e-mail") communications between November 29, 1994 and January 25, 1995. Concurrently, Baker continued to distribute violent sordid tales on the electronic bulletin board. On January 9, 1995, Baker brazenly disseminated publicly, via the electronic bulletin board, a depraved torture-and-snuff story in which the victim shared the name of a female classmate of Baker's referred to below as "Jane Doe" [3] (*see* note 1 *supra* ). This imprudent act triggered notification of the University of Michigan authorities by an alarmed citizen on January 18, 1995. On the following day, Baker admitted to a University of Michigan investigator that he had authored the story and published it on the Internet.

Later that month, pursuant to Baker's written consent, university security personnel searched the defendant's dormitory room, personal papers, and computer files including his unique e-mail compartment. This investigation surfaced a second violent and reprehensible tale featuring Jane Doe's actual name, as well as her accurate residential address. The search of Baker's electronic mailbox disclosed a chilling correspondence between the defendant and Gonda chronicling the two men's plans of·abduction, bondage, torture, humiliation, mutilation, rape, sodomy, murder, and necrophilia. Most ominously, these messages cumulated in a conspiracy between the two men to realize their aberrant e-mail discussions and exchanges by implementing an actual abduction, rape, and murder of a female person.

On February 9, 1995, a United States magistrate judge issued a warrant for Baker's arrest pursuant to a criminal complaint which alleged a violation of 18 U.S.C. 875(c),

start humping her face furiously. The pain of the hot curling iron in her tender asshole sent her whole body into convulsions; her throat clenched against my cock. God! This felt so good.

Leaving the iron up her asshole, Jerry reached out, pulled one of her small tits away form [sic] her body. Jerry took his knife, and cut her nipple off. She gags on my cock some more, and I pull out just in time to cum all over her pretty face.

As I spew loads of hot white cum onto her face, Jerry continues to maul at her breasts. He pulls them as far as they'll go away from her body, twisting them to cause even more pain. Now that she doesn't have my cock down her throat, gagging her, [FIRST NAME OMITTED] howls out loud. It's not even a human sound. Her eyes glaze over from the pain and torture; a ball of my cum smacks her in the left eye.

Spent, I go grab a beer and watch Jerry finish off play. When he pulls the curling iron from [FIRST NAME OMITTED]'s asshole, her sensitive skin is all burned. He pressed the head of his cock against the tortured opening. Jerry's got a savagely big dick, and would have hurt this girl even if her ass hadn't been burned. [FIRST NAME OMITTED] let out a small scream, but was too weak at this point to make it really loud. She only made fierce grunts as my friend's cock tore apart the inside of her scorched asshole.

I timed Jerry at this. He had a good constitution [sic]. For ten minutes he buggered poor pretty [FIRST NAME OMITTED]. Then he

finally came inside her. Standing up, he walked around to see her face. Tears and sweat mixed with my cum on her cute face. Jerry grabbed a handful of her hair and pulled her face up to look. Her eyes, barely human, begged him to stop. He laughed aloud and gave her a firm smack. Her head jerked sideways with a snap.

"C'mon, man, let's go." My friend said. So we got the gasoline and spread it all over [FULL NAME OMITTED]'s apartment. We chucked it over her. It must have burned like hell when it came into contact with her open cuts, but I couldn't tell. Her face was already a mask of pain, and her body quivered fiiercely [sic].

"Goodbye, [FIRST NAME OMITTED]" I said, and lit a match ...

J.App. at 91–93.

2. The true identity and current whereabouts of "Arthur Gonda" are unknown.

3. Although the true name of "Jane Doe" was known to the district court and to this appellate forum, her identity has been concealed to spare this young woman any additional and unnecessary fear, emotional trauma, or embarrassment. The record reflected that during an interview concerning Baker's Jane Doe publication conducted by a University of Michigan investigator, Jane Doe "appeared to be controlling herself with great difficulty[,]" resulting in a recommendation for psychological counseling by University of Michigan personnel. J.A. at 292.

supported by an affidavit sworn by an agent of the Federal Bureau of Investigation (F.B.I.). Baker's arrest occurred later that day. On the following day, February 10, 1995, the magistrate ordered the defendant detained pending trial as a danger to the community. That order was subsequently approved by a district judge, and was later affirmed by the Sixth Circuit. *United States v. Alkhabaz*, 48 F.3d 1220 (6th Cir.1995) (Table). On February 14, 1995, a grand jury returned a single count indictment which charged Baker with having, between December 2, 1994 and January 9, 1995, "knowingly transmitted communications in interstate and foreign commerce containing a threat to injure the person of another" in violation of 18 U.S.C. § 875(c). However, the district court ordered the appellant released to his mother's custody on March 10, 1995, after a court-ordered psychological evaluation concluded that Baker posed no menace to community safety. *See United States v. Baker*, 890 F.Supp. 1375, 1379–80 (E.D.Mich.1995).

On March 15, 1995, a grand jury issued a five-count superseding indictment, each count of which embraced, in the language of the statute, all of the elements of the criminal act identified in section 875(c). The superseding indictment charged Baker, in each of its five counts: [4]

> COUNT ONE: (Transmitting Threatening Communications—18 U.S.C. § 875(c))

D–1 JAKE BAKER

D–2 ARTHUR GONDA

> On or about December 1 and 2, 1994, within the Eastern District of Michigan, Southern Division, JAKE BAKER and ARTHUR GONDA, defendants herein, knowingly transmitted communications in interstate and foreign commerce containing a threat to injure another person, that is, JAKE BAKER sent an e-mail computer transmission to ARTHUR GONDA stating:

> > I highly agree with the type of woman you like to hurt. You seem to have the same tastes I have. When you come down, this'll be fun!

> > Also, I've been thinking. I want to do it to a really young girl first. !3 or 14. There innocence makes them so much more fun—and they'll be easier to control. What do you think? I haven't read your entire mail yet. I've saved it to read later, in private. I'll try to write another short phantasy and send it. If not tomorrow, maybe by Monday. No promises.

ARTHUR GONDA responded with the following e-mail message to JAKE BAKER:

> I would love to do a 13 or 14 year old. I think you are right ... not only their innocence but their young bodies would really be fun to hurt. As far as beeing easier to control ... you may be right, however you can control any bitch with rope and a gag ... once tey are tieed up and struggling we could do anything we want to them ... to any girl. The trick is to be very careful in planning. I will keep my eye out for young girls, and relish the fantasy ... BTW [by the way] how about your neighbour at home, youm may get a chance to see her ... ? ... ?

JAKE BAKER responded with an e-mail message to ARTHUR GONDA stating,

> True. But young girls still turn me on more. Likely to be nice and tight. Oh. they'd scream nicely too!

> Yeah. I didn't see her last time I was home. She might have moved. But she'd be a great catch. She's real pretty. with nice long legs. and a great girly face ... I'd love to make her cry ...

all in violation of Title 18, United States Code, Section 875(c).

> COUNT TWO: (Transmitting Threatening Communications—18 U.S.C. § 875(c))

D–1 JAKE BAKER

> On or about December 9, 1994, within the Eastern District of Michigan, Southern Division, JAKE BAKER, defendant here-

---

**4.** Quotations in the superseding indictment from the e-mail correspondence retain original profanities, misspellings, ungrammatical phraseology, punctuation defects, typographical errors, and other deficiencies.

in, knowingly transmitted communications in interstate and foreign commerce containing a threat to kidnap another person, that is, JAKE BAKER sent an e-mail computer transmission to ARTHUR GONDA stating:

> I just picked up Bllod Lust and have started to read it. I'll look for "Final Truth" tommorrow (payday). One of the things I've started doing is going back and re-reading earlier messages of yours. Each time I do. they turn me on more and more. I can't wait to see you in person. I've been trying to think of secluded spots. but my area knowledge of Ann Arbor is mostly limited to the campus. I don't want any blood in my room, though I have come up with an excellent method to abduct a bitch ___
>
> As I said before, my room is right across from the girl's bathroom. Wiat until late at night. grab her when she goes to unlock the door. Knock her unconscious. and put her into one of those portable lockers (forget the word for it). or even a duffle bag. Then hurry her out to the car and take her away ... What do you think? [5]

all in violation of Title 18, United States Code, Section 875(c).

COUNT THREE: (Transmitting Threatening Communications—18 U.S.C. § 875(c))

D–1 JAKE BAKER

[This charge reiterated verbatim the substantive allegations of Count 2 (threat to kidnap), but avers that this communication constituted a threat to injure].

COUNT FOUR: (Transmitting Threatening Communications—18 U.S.C. § 875(c))

D–1 JAKE BAKER

D–2 ARTHUR GONDA

On or about December 10, 1994, within the Eastern District of Michigan, Southern Division, JAKE BAKER and ARTHUR GONDA defendants herein, knowingly transmitted communications in interstate and foreign commerce containing a threat to injure another person, that is, ARTHUR GONDA sent an e-mail computer transmission to JAKE BAKER stating:

> Hi Jake. I have been out tonight and I can tell you that I am thinking more and more about doing' a girl. I can picture it so well ... and I can think of no better use for their flesh. I HAVE to make a bitch suffer!
>
> As far as the Teale-homolka killings, well I can think of no tastier crimes ... BTW have you seen any pictures of the girls? You have to see these cunts! They must have been so much fun ... please let me know any details that I cannot get here.[6] I would love to see what you think about it. . . .
>
> As far as the asian bitch story, there is only one possible ending. . . .

JAKE BAKER responded with an e-mail computer transmission to ARTHUR GONDA stating:

> Are tastes are so similar. it scares me:-) When I lay down at night. all I think of before sleep is how I'd torture a bitch I get my hands on. I have some pretty vivid near-dreams too. I wish I could remember them when I get up.

all in violation of Title 18, United States Code, Section 875(c).

COUNT FIVE: (Transmitting Threatening Communications—18 U.S.C. § 875(c))

D–1 JAKE BAKER

D–2 ARTHUR GONDA

On or about December 11 and 12, 1994, within the Eastern District of Michigan,

---

**5.** The superseding indictment neglected to relate Gonda's reply, which was:
> I think that it is best to disconnect yourself as much as possible from the crime. The police, would surely come around asking questions ... leaving with a huge bag may look very suspicious to anyone who might see you. Also, she might scream when you hit her, arousing the suspicion of the other people in the dorm

**6.** Gonda referenced the sex-slayings of two teen-aged girls in Canada which was subject to a news blackout in that country pending further investigation and prosecution of the suspect.

> ... A dorm may be too populated for an abduction ... also, it would be better to go for complete strangers. J.A. at 181.

Southern Division, JAKE BAKER and ARTHUR GONDA defendants herein, knowingly transmitted communications in interstate and foreign commerce containing a threat to injure another person, that is, after JAKE BAKER had written and transmitted numerous stories and e-mail messages over the Internet computer system between September and December 1994 dealing with the abduction, rape, torture, mutilation and murder of women, and having received an e-mail message from ARTHUR GONDA stating:

> It's always a pleasure hearing back from you … I had a great orgasm today thinking of how you and I would torture this very very petite and cute, south american girl in one of my classes … BTW speaking of torture, I have got this great full length picture of the Mahaffy girl Paul Bernardo killed, she is wearing this short skirt!

JAKE BAKER responded with an e-mail computer transmission to ARTHUR GONDA stating:

> Just thinking about it anymore doesn't do the trick … I need TO DO IT.

ARTHUR GONDA wrote back via an e-mail message to JAKE BAKER stating:

> My feelings exactly! We have to get together … I will give you more details as soon as I find out my situation. . . .

JAKE BAKER responded with the following e-mail computer transmission to ARTHUR GONDA:

> Alrighty then. If not next week. or in January. then definitely sometime in the Summer. Pickings are better than too. Although it's more crowded.[7]

all in violation of Title 18, United States Code, Section 875(c).

On April 25, 1995, Baker moved to quash the superseding indictment, averring that the charged communications were not "true threats" as that term has been defined by the Supreme Court and federal appellate courts and hence constituted innocuous speech protected by the First Amendment. The lower court agreed, dismissing all five counts of the superseding indictment. *United States v. Baker*, 890 F.Supp. 1375 (E.D.Mich.1995). The government's appeal *sub judice* followed. *See Serfass v. United States*, 420 U.S. 377, 394, 95 S.Ct. 1055, 1065–66, 43 L.Ed.2d 265 (1975). Although the majority of this panel now affirms the judgment of the district court, it has avoided addressing the First Amendment issue. Instead it mandates, by judicial license, that the communications charged in the superseding indictment did not constitute "threats" of *any* kind because the panel majority interprets section 875(c) to require, as a matter of law, that a "threatening" communication must be accompanied by an intent to intimidate or coerce someone to attain some "change" or "goal." It is obvious, however, from the concise language of 18 U.S.C. § 875(c) that Congress refused to include an "intent to intimidate or coerce someone to attain some change or goal" as an element of the criminal act addressed therein:

> Whoever transmits in interstate or foreign commerce any communication containing *ANY threat to kidnap ANY person* or *ANY threat to injure the person of another*, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c) (emphases added).

The words in section 875(c) are simple, clear, concise, and unambiguous. The plain, expressed statutory language commands only that the alleged communication must contain *any threat* to kidnap or physically injure *any person*, made for *any reason* or no reason. Section 875(c) by its terms does *not* confine the scope of criminalized communications to those directed to identified individuals and intended to effect some particular change or goal. This circuit has already considered

---

7. The superseding indictment did not cite relevant communications between the two "friends" after December 12, 1994. On January 9, 1995, the same day that Baker published his abhorrent story about Jane Doe on the Internet, Gonda wrote to Baker:

> Thanks for the stories, Jake … I am buying a car this week. I am shopping around for it now, and I shaould [sic] have it on the road by this weekend hopefully. I will definitely come and see you when I have the time … I am going to read the stories and masturbate now. J.A. at 227.

1502

and decided the meaning of section 875(c) in *United States v. DeAndino,* 958 F.2d 146, 148 (6th Cir.), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992), a decision in which a member of this panel concurred, wherein it defined, to the exclusion of "intimidation," the three essential elements under 18 U.S.C. § 875(c):

> (1) a transmission in interstate [or foreign] commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure the person of another[.]

Accordingly, *DeAndino* imposes its interpretation of 18 U.S.C. § 875(c) as prevailing precedent in this circuit until it is modified or overruled by the entire court sitting en banc or by Supreme Court direction. By contrast, the majority's extra-legislative graft upon specific Congressional language materially deforms the criminal act defined by the enactment by judicially implanting "intent to intimidate or coerce someone to attain some change or goal" as an element of the criminal act, thus enhancing the government's threshold burden of proof in pursing prosecutions pursuant to this criminal statute.

By contrast to section 875(c), a companion statutory provision, 18 U.S.C. § 875(b), *criminalizes similar communications made with the intent to extort money or other value,* coupled with more severe penalties than those appertaining to a threat illegalized by section 875(c):

> Whoever, *with intent to extort* from any person, firm, association, or corporation, *any money or other thing of value,* transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(b) (emphases added).

Patently, Congress sought to punish *all* interstate or international communications containing a threat to kidnap or injure any person; such communications accompanied by an intent to extort value (section 875(b)) could be punished more severely than those which are not coupled with the intent to extort (section 875(c)). If Congress, by enacting section 875(c), had desired to pro-

scribe only those threats intended by the maker to intimidate someone, it could have clearly accomplished that result as it did under section 875(b) wherein it directed that threats under that subsection must be issued with the intent to extort value. *See also* 18 U.S.C. § 875(d) (outlawing interstate or transnational communications, made with intent to extort money or other value, which threaten to injure the property or reputation of another or threaten to accuse another of a crime); *cf.* 18 U.S.C. §§ 248(a), 876, and 877.

The panel majority attempts to justify its improper fusion of an extra-legislative element re the "intent to intimidate some change or goal" upon section 875(c) by embracing an artificially narrow legal definition of the term "threat." The panel majority posits, "[a]t their core, threats are tools that are employed when one wishes to have some effect, or achieve some goal, through intimidation." However, this interpretation does not comprise the *exclusive* ordinary or legal meaning of the word "threat." Undeniably, a simple, credible declaration of an intention to cause injury to some person, made for any reason, or for no reason whatsoever, may *also* constitute a "threat." For instance, Black's Law Dictionary 1480–81 (6th ed. 1990) adopts, among other definitions, the following:

> **Threat.** *A communicated intent to inflict physical or other harm on any person or on property. A declaration of an intention to injure another or his property by some unlawful act. A declaration of intention or determination to inflict punishment, loss, or pain on another, or to injure another or his property by the commission of some unlawful act....*

> *The term, "threat"* [sic] *means an avowed present determination or intent to injure presently or in the future.* A statement may constitute a threat even though it is subject to a possible contingency in the maker's control. The prosecution must establish a "true threat," which means a serious threat as distinguished from words uttered as mere political argument, idle talk or jest. In determining whether words were uttered as a threat the context

in which they were spoken must be considered.

(Emphases added & citations omitted).

Although some reported threat convictions have embraced a form or degree of intimidation, this circuit has not previously adopted that element as an essential component of a prosecution under 18 U.S.C. § 875(c). To the contrary, controlling precedents clearly reflect the principle that a message is a "threat" *if a reasonable recipient would tend to believe that the originator of the message was serious about his words and intended to effect the violence or other harm forewarned,* regardless of the speaker's actual motive for issuing the communication. In *United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir.), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992), this court reversed the trial court's dismissal of a section 875(c) indictment, commanding that the government need prove only the author's objective (or general) intent, as opposed to a subjective (or specific) intent, to threaten a person. *Id.* at 148–50. A "general intent" to threaten exists where a reasonable person would objectively take the defendant's statement to be a "serious expression of an intention to inflict bodily harm[,]" whereas a "specific intent" to threaten exists only where the speaker subjectively intended, in fact, to threaten a person. Because under *DeAndino* the prosecution need prove only that the speaker *objectively* intended to threaten a person by his statement(s), no proof that the publisher of the threat *subjectively* intended to threaten anyone by his communication is necessary. *Id.* at 148 (citation omitted). Similarly, no proof that the speaker had intended to intimidate anyone to attain some change or goal was required in *DeAndino;* the opinion does not suggest that the burden placed upon the government to prove a threat under section 875(c) included proof of motivation for conveying the threat.

Moreover, in *United States v. Cox,* 957 F.2d 264 (6th Cir.1992) (per curiam), this circuit has precedentially directed that a communication would be construed as conveying a "threat" if that communication "had a reasonable tendency to create apprehension that its originator will act in accordance with its tenor." *Id.* at 266. The ultimate issue for the *Cox* court was whether "a reasonable jury could find that the threat was properly perceived as real." *Id.* In so ruling, the circuit court pronounced that "a threat is not a state of mind in the threatener; it is an appearance to the victim." *Id.* at 266. In *Cox,* the defendant had communicated a vague telephonic threat to hurt unidentified people at a bank. The employee who received the call, as well as a second employee who learned the contents of the communication, justifiably believed that the threatening caller was serious. *Id.* Accordingly, the gravamen of a threat, namely the appearance that the speaker would implement the harms threatened, exists whenever a rational jury could find that an objective recipient of the communication would, under similar circumstances, reasonably tend to believe the speaker's menacing words.[8]

8. This circuit has applied this same principle in cases involving threats directed against the President or his successors, but issued to third persons, prosecuted under 18 U.S.C. § 871(a). This circuit has concluded that, although those minatorial communications were not necessarily intended to intimidate anyone or coerce any conduct or forbearance, those threats were actionable because they were deemed credible. *See, e.g., United States v. Glover,* 846 F.2d 339, 343–44 (6th Cir.) (upholding a conviction for mailing threatening letters from a prison to the White House because a reasonable person would foresee that the recipient of these missives would interpret them as expressions of a serious intention to harm the President, even if no one would reasonably be intimidated by them because the author was incapacitated by incarceration), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988); *United States v. Lincoln,* 462 F.2d 1368, 1369–70 (6th Cir.) (per curiam) (affirming a conviction for a threat to kill the President made to an F.B.I. agent under circumstances which would cause a reasonable person to believe that the speaker meant to act on his words), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). *See generally United States v. Kosma,* 951 F.2d 549, 554–55 (3rd Cir.1991) (collecting cases wherein threats to assassinate or injure the President, often of a vague nature, made to third parties such as mental health professionals or law enforcement officials, were deemed credible threats and hence prosecutable even though facially not intended to intimidate anyone into any action or forbearance). *Accord, United States v. Lincoln,* 589 F.2d 379, 381 (8th Cir.1979) (per curiam) (affirming a conviction under 18 U.S.C. § 876

Thus, the plain language of 18 U.S.C. § 875(c), together with its interpretive precedents, compels the conclusion that "threats" within the scope of the statute in controversy include all reasonably credible communications which express the speaker's objective intent to kidnap or physically injure another person. Whether the originator of the message intended to intimidate or coerce anyone thereby is irrelevant. Rather, the pertinent inquiry is whether a jury could find that a reasonable recipient of the communication would objectively tend to believe that the speaker was serious about his stated intention. *See DeAndino,* 958 F.2d at 148–50; *Cox,* 957 F.2d at 266; *United States v. Smith,* 928 F.2d 740, 741 (6th Cir.), *cert. denied,* 502 U.S. 852, 112 S.Ct. 159, 116 L.Ed.2d 124 (1991); *United States v. Vincent,* 681 F.2d 462, 464 (6th Cir.1982); *Lincoln,* 462 F.2d at 1369 (*quoting Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969)).[9] There can be no doubt that a rational jury could find that some or all of the minacious communications charged in the superseding indictment against Baker constituted threats by the defendant to harm a female human being,[10] which a reasonable objective recipient of the transmissions could find credible.[11]

Because the communications charged against Baker could be found by a rational

9. *Cf. United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996), a decision under the federal Freedom of Access to Clinical Entrances Act of 1994 (18 U.S.C. § 248), which illegalized, inter alia, threats of force used to intimidate any person from obtaining or providing reproductive health services, in which the Eighth Circuit mandated that a forbidden threat exists where, in light of its entire factual context, "the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure [someone] presently or in the future.'" *Id.* at 925 (citation omitted).

[for mailing threatening letters from prison to judges of the Eighth Circuit; the court implicitly resolved that intimidation was not an essential characteristic of a "threat" by dictating that "[t]he government does not have to establish that the defendant in a particular case had the actual capacity to successfully accomplish the threatened action"). Although these cases were prosecuted under statutes other than 18 U.S.C. § 875(c), and diverse considerations inform the punishment of threats against high federal officials vis a vis average citizens as developed in note 13 below, these decisions nonetheless lend further support to the principle recognized by this circuit in *DeAndino* and *Cox* that a section 875(c) threat exists where a rational recipient of the communication would tend to believe that the originator of the threatening language meant to perform the misdeeds forewarned.]

10. Section 875(c) does not require that actionable threats be made against a specific identifiable person. Rather, a credible threat made against an identifiable category of individuals is sufficient. *See Cox,* 957 F.2d at 265–66 (ruling, respecting a threat to injure unspecified persons at a bank, that "a specific individual as a target of the threat need not be identified"); *United States v. Schroeder,* 902 F.2d 1469, 1470–71 (10th Cir.) (resolving that a threat to shoot unspecified persons at an unidentified post office was sufficient to support a jury finding that the defendant had issued a section 875(c) "threat"), *cert. denied,* 498 U.S. 867, 111 S.Ct. 181, 112 L.Ed.2d 145 (1990). In the instant action, count one of the superseding indictment quoted language communicated by Baker to Gonda which reflected a desire to injure a specific although unnamed hometown neighbor of Baker's. Additionally, the government's bill of particulars filed on April 10, 1995 identified, as additional alleged targeted victims, girls aged 13 and 14 years who resided near Baker in Ann Arbor, Michigan and teenaged girls who lived near Baker's home in Boardman, Ohio (count 1); female students who resided in Baker's university dormitory (counts 2 and 3); and women who were the subjects of Baker's e-mail transmissions to Gonda and his stories posted on the Internet, including Jane Doe (counts 4 and 5). J.A. at 26–29. In any event, the identity of specific targets was not crucial to the credibility of Baker's threats because his expressed purpose was to harm *some* female, not necessarily any particular woman.

11. The majority's concern that interpreting 18 U.S.C. § 875(c) to encompass threatening messages sent by persons who did not intend to achieve some coercive result would effectively criminalize the legitimate and innocent reiteration, such as by news reporters, trial watchers, or publishers of judicial opinions, of communications initiated by another, is misplaced. To constitute a threat under section 875(c), the communication at issue must be accompanied by the perpetrator's general intent to kidnap or harm someone. Stated differently, by promulgating the menacing verbiage, the speaker must be expressing a credible intention to perform, or cause to be performed, the forbidden actions. Typically, only the originator of the minatorial communication, or a confederate, could possess or express this intent. By contrast, a person who republishes the threatening language for legitimate or otherwise innocuous purposes cannot reasonably be deemed to have articulated an intent to kidnap or injure any person.

jury to constitute "threats" within the ambit of 18 U.S.C. § 875(c), the district court's resolution that a rational jury could not find that any of these communications comprised constitutionally unprotected "true threats" is ripe for review.[12] The Supreme Court has recognized that, while the First Amendment extends varying degrees of protection against government censure to most forms of expression (with political speech receiving the most stringent safeguards), *see NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 926–27, 102 S.Ct. 3409, 3432–33, 73 L.Ed.2d 1215 (1982); *Virginia St. Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 760–62, 96 S.Ct. 1817, 1824–26, 48 L.Ed.2d 346 (1976), certain forms of speech are deemed unworthy of any constitutional protection and consequently may be criminalized. A "threat" is a recognized category of expression which warrants no First Amendment protection. *E.g., Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 773–74, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994). However, only communications which convey "true threats" (as opposed to, for example, inadvertent statements, mistakes, jests, hyperbole, innocuous talk, or political commentary not objectively intended to express a real threat) are "threats" outside the embrace of the First Amendment's guarantees. *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam). *Accord, Cox,* 957 F.2d at 265–66; *DeAndino,* 958 F.2d at 148–49; *Lincoln,* 462 F.2d at 1369.

In *Watts,* the Court announced that "threats" against the President were obviously proscribable, but also recognized that, as "pure speech" which may be imbued with protected political commentary, such ostensibly minatory speech must be assessed for its true nature—that is, whether it constituted mere political commentary or hyperbole, which was protected, or constituted a *"true threat,"* which is not protected. Watts had stated at a public rally that he would not willingly submit to the draft but, if forced to carry a rifle, "the first man I want to get in my sights is L.B.J." *Watts,* 394 U.S. at 706, 89 S.Ct. at 1401. The Court instructed that this statement, in its factual context, was not a "true threat" which could be constitutionally prosecuted, but instead was mere "political hyperbole" immunized by the First Amendment.[13] *Id.* at 708, 89 S.Ct. at 1401.

Consequently, a communication which an objective, rational observer would tend to interpret, in its factual context, as a credible threat, is a "true threat" which may be punished by the government. *See id.* at 707–8, 89 S.Ct. at 1401. *Accord, DeAndino,* 958 F.2d at 149. The majority's disposition notwithstanding, logic dictates that any objectively credible representation of an intent to harm someone should be considered *both* a "threat" by the statement's originator, as well as a "true threat" beyond the scope of the First Amendment's free speech guarantees.[14] *See DeAndino,* 958 F.2d at 148. *Ac-*

---

12. The determination whether a communication embodies a "true threat" resides in the fact finder. *See Cox,* 957 F.2d at 266; *United States v. Glover,* 846 F.2d 339, 344 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988); *accord, United States v. Kosma,* 951 F.2d 549, 555 (3rd Cir.1991); *United States v. Gilbert,* 884 F.2d 454, 458 (9th Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990); *United States v. Howell,* 719 F.2d 1258, 1260 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Carrier,* 672 F.2d 300, 306 (2nd Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982); *United States v. Lincoln,* 589 F.2d 379, 382 (8th Cir.1979).

13. The Supreme Court has recognized that the considerations which remove threats of violence outside the reach of the First Amendment apply with "special force" to threats which menace the President. *R.A.V. v. St. Paul,* 505 U.S. 377, 388,

112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992). Manifestly, the public has a greater countervailing interest in the security of the President than in the safety of an ordinary citizen. On the other hand, threats against the President are often accompanied by political commentary, which is jealously guarded by the First Amendment. *E.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 926–27, 102 S.Ct. 3409, 3432–33, 73 L.Ed.2d 1215 (1982); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam). By contrast, threats against private individuals are typically devoid of political content and hence should be accorded less stringent First Amendment protection.

14. Accordingly, the district court's adoption of the stringent "true threat" legal standard promulgated by the Second Circuit in *United States v. Kelner,* 534 F.2d 1020 (2nd Cir.), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623

*cord, Melugin v. Hames,* 38 F.3d 1478, 1484 (9th Cir.1994).

The majority's disposition leads to absurd results where, as in the case at bench, minacious communications have been made which may satisfy the constitutional "true threat" standard because a reasonable jury could find that those communications contained believable expressions of an intention to injure a person, yet those same communications are nonetheless deemed beyond the reach of 18 U.S.C. § 875(c) as not constituting "threats" as a matter of law, merely because the subject communications were not made with the intent to realize a specific purpose through intimidation.[15] Although Congress, via section 875(c), clearly intended to punish *every* credible interstate or transnational expression of an intent to kidnap or injure another person, the majority's legally erroneous unduly restrictive interpretation of the word "threat" as used in section 875(c) effectively divests Congress of its constitutional lawmaking authority by artificially confining the intended scope of section 875(c) to a degree not compelled by the First Amendment.

Accordingly, in order to prove a "true threat" proscribed by 18 U.S.C. § 875(c) and unprotected by the First Amendment, the prosecution must evidence to a rational jury's satisfaction *only* the following: (1) that the defendant transmitted the subject communication in interstate or foreign commerce, (2) that the communication contained a threat,

(3) that the threat was one against the physical safety or freedom of some individual or class of persons (irrespective of the identity of the person or group threatened, the originator's motivation for issuing the threat, or the existence or nonexistence of any goal pursued by the threat), and (4) that the subject communication in its factual context would lead a reasonable, objective recipient to believe that the publisher of the communication was serious about his threat (regardless of the subjective intent of the speaker to make an actual threat or whether anyone actually felt frightened, intimidated, or coerced by the threat). *See generally United States v. DeAndino,* 958 F.2d 146, 148–50 (6th Cir.), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992).

Finally, the facts of the instant case justify reversal and remand because they even satisfy the judicially legislated edict articulated in the majority opinion. Assuming *arguendo* that a threat under 18 U.S.C. § 875(c) requires a general intent by the speaker to attain some result or change through intimidation (which it does not), a rational jury could conclude that this element was proved in this case. By publishing his sadistic Jane Doe story on the Internet, Baker could reasonably foresee that his threats to harm Jane Doe would ultimately be communicated to her (as they were), and would cause her fear and intimidation, which in fact ultimately occurred. The panel majority may casually conclude within the security of chambers that

(1976), which the majority herein did not have occasion to address, should be rejected. *See Baker,* 890 F.Supp. at 1381–85. The *Kelner* test commands that a threat must be "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution," both on its face and in its context, to qualify as a constitutionally proscribable "true threat." *Kelner,* 534 F.2d at 1027. The Sixth Circuit has refused to adopt this standard, which, for the reasons developed in this dissent, unjustifiably constrains, to a degree not demanded by the First Amendment, the authority of Congress to punish threats. Rather, contrary to the lower court's conclusion, every communication conveying an intention to kidnap or injure any person sent in interstate or foreign commerce which would appear to an objective, rational recipient to be a statement of a serious intent to commit the harms menaced is constitutionally prosecutable.

**15.** The majority's opinion reflects this inherent logical contradiction. The majority opinion recites:

> The government must allege and prove three elements to support a conviction under Section 875(c): "(1) a transmission in interstate [or foreign] commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure [or kidnap] the person of another." *DeAndino,* 958 F.2d at 148. In this case, the first and third elements cannot be seriously challenged by the defendant.

Accordingly, the majority recognized that the transmissions attributed to Baker expressed threats to injure or kidnap a person (element 3), yet it subsequently ruled that these threats nonetheless were not section 875(c) "threats" simply because Baker did not issue them with the intent to intimidate anyone (a requirement which the majority reads into element 2).

Baker's threats conveyed to Jane Doe in his articles published on the Internet were non-intimidating. However, Jane Doe's reaction to those threats when brought to her attention evinces a contrary conclusion of a shattering traumatic reaction that resulted in recommended psychological counselling. *See* note 3 above.

A jury in the instant case could reasonably infer, in the light of all the evidence, that Baker intended the foreseeable, natural, and ordinary consequences of his voluntary actions. *See, e.g., Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Alexander v. Foltz,* 838 F.2d 140, 145–46 (6th Cir.), *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988); *United States v. Lewis,* 644 F.Supp. 1391, 1406 (E.D.Mich. 1986), *aff'd,* 840 F.2d 1276 (6th Cir.), *cert. denied,* 488 U.S. 894, 109 S.Ct. 234, 102 L.Ed.2d 224 (1988). Indeed, a rational jury could infer that the reason Baker published his Jane Doe story featuring the actual name of a young woman was the probability that its threats would be communicated to her and cause her to suffer fear, anxiety, and intimidation.[16] Moreover, the e-mail correspondence between Baker and Gonda evidenced overt acts of a conspiracy to violate 18 U.S.C. § 875(c) in that the two men clearly agreed *at the least* to threaten, and otherwise implement their conspiracy by intimidating, one or more women or young girls with physical harm as discussed in their plans. *See, e.g., United States v. Dolt,* 27 F.3d 235, 238 (6th Cir.1994) ("Conspiracy involves an agreement wilfully formed between two or more persons to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy.")

Accordingly, I would reverse the district court's judgment which dismissed the superseding indictment as purportedly not al-

leging "true threats," and remand the cause to the lower court. **I DISSENT.**

---

**16.** The majority posits that their judicially-mandated "intent to achieve some change or goal by intimidation" element can be satisfied by proof that the publisher of the threat sought to engender fear in others for its own sake:

> Finally, a threat may be communicated for a seemingly innocuous purpose. For example,

one may communicate a bomb threat, even if the bomb does not exist, for the sole purpose of creating a prank. However, such a communication would still constitute a threat because the threatening party is attempting to create levity (at least in his or her own mind) through the use of intimidation.